# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CR-21-332-RAW** |
| | ) | |
| **KASIE KEYS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

The Defendant Kasie Keys was indicted on six counts of child abuse in Indian country, in violation of 18 U.S.C. §§ 1151, 1152, & 21 Okla. Stat. § 843.5(A), and two counts of child neglect in Indian Country, in violation of 18 U.S.C. §§ 1151, 1152, & 21 Okla. Stat. § 843.5(C). The Defendant urges the Court to exclude the proposed testimony of several doctors and a nurse identified as experts by the Government, on the grounds that their opinions do not meet the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), and Fed. R. Evid. 702. The Court referred the Defendant's Motion to Exclude Expert Witness Testimony Pursuant to *Daubert* and Federal Rule of Evidence 702 [Docket No. 135] to the undersigned Magistrate Judge for findings and recommendation pursuant to 28 U.S.C. § 636(b)(1) [Docket No. 139], and an evidentiary hearing was conducted on August 16-17, 2022. *See* Docket Nos. 154-155. For the reasons set forth below, the undersigned Magistrate Judge hereby recommends that the Defendant's Motion to Exclude Expert

Witness Testimony Pursuant to *Daubert* and Federal Rule of Evidence 702 [Docket No. 135] be GRANTED in part and DENIED in part.

The Court also directed that the Defendant's expert be included in the *Daubert* hearing. *See* Docket No. 133, p. 1. As a result, Defendant's proposed expert witness **Dr. Curtis Grundy** testified at the two-day *Daubert* hearing on August 16, 2022 along with the Government's seven proposed expert witnesses. Following the hearing, the U.S. filed the Government's Motion to Exclude Expert Witness Testimony and Motion to Compel Records [Docket No. 177], seeking to exclude Dr. Grundy's testimony. The Court likewise referred this motion to the undersigned Magistrate Judge for findings and recommendation pursuant to 28 U.S.C. § 636(b)(1) [Docket No. 179]. In response to the Government's motion, the Defendant conceded that Dr. Grundy's testimony should be ruled inadmissible as it would violate Fed. R. Evid. 403 because his testimony would be an improper evaluation of the Defendant's credibility. The undersigned Magistrate Judge therefore finds that the Government's Motion to Exclude Expert Witness Testimony and Motion to Compel Records [Docket No. 177] should be granted as to the request to exclude Dr. Grundy's testimony and denied as moot as to the motion to compel records.

## BACKGROUND

The charges against the Defendant in this case all stem from allegations regarding her treatment of her son, G.Y., who was born in 2009. By the time G.Y. was six years old, his medical record included diagnoses of cerebral palsy, autism disorder, pseudo obstruction, and chronic lung disease, and he had a gastrostomy tube ("g-tube") for

feedings, a suprapubic catheter, nasal cannula for oxygen, and a wheelchair. During a December 2014-January 2015 hospital admission, G.Y. was also started on Total Parenteral Nutrition ("TPN") for a pseudo obstruction; it was discontinued in February 2015 but then re-started and continued at some level through a portion of 2018. In April 2018, G.Y. was placed on hospice care. In June 2018, G.Y. had two episodes where his condition worsened to the point hospice nurses did not think he would survive. He was admitted to the hospital and ultimately removed from his mother's care following a July 2018 Oklahoma DHS investigation related to these same charges.

## I.    LEGAL STANDARD UNDER *DAUBERT* & FRE 702

The undersigned Magistrate Judge now turns to the Government's proposed seven expert witnesses in this case. A witness who is qualified as an expert by knowledge, skills, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Government as proponent of the evidence has the burden to show it is admissible under Rule 702. *See, e. g., United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc). However, the undersigned Magistrate Judge notes the "'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers

-3-

to 'opinion' testimony.'" *Daubert*, 509 U.S. at 588 (*quoting Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)).  "Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, and the trial court has broad discretion in deciding whether to admit or exclude expert testimony."  *United States v. DeLeon*, 2021 WL 4909981, at *15 (D.N.M. Oct. 21, 2021) (citations omitted).  And the "fields of knowledge which may be drawn upon are not limited merely to the 'scientific' and 'technical' but extend to all 'specialized' knowledge.[] Thus, within the scope of the rule are not only experts in the strictest sense of the word, *e.g.*, physicians, physicist, and architects, but also the large group sometimes called 'skilled' witnesses[.]"  Advisory Committee Notes to Fed. R. Evid. 702, 1972 Proposed Rules.  "And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'"  *Kumho Tire*, 526 U.S. at 149 (*quoting Daubert*, 509 U.S. at 592).

But "[b]efore considering whether an expert's testimony is reliable or helpful to the jury, 'the district court generally must first determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion.'" *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1136 (10th Cir. 2014) (*quoting Nacchio*, 555 F.3d at 1241).  Only then must a Court "satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony."  *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006).

-4-

*See also Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) ("Fed. R. Evid. 702 imposes on a district court a gatekeeper obligation to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'") (*quoting Daubert*, 509 U.S. at 589).

In its "gatekeeping role, the district court must make specific findings on the record so that the appellate court can determine if it carefully reviewed the objected-to expert testimony under the correct standard." *United States v. Stevenson*, 2022 WL 4368466, at *1 (E.D. Okla. Sept. 21, 2022) (*citing, inter alia*, *United States v. Cushing*, 10 F.4th 1055, 1079 (10th Cir. 2021)). "Reliability is about the reasoning and methodology underlying the expert's opinion. Relevance is about whether the expert testimony will assist the trier of fact or whether it instead falls within the juror's common knowledge and experience and will usurp the juror's role of evaluating a witness's credibility." *United States v. Wofford*, 766 Fed. Appx. 576, 581 (10th Cir. 2019) (internal citations and quotations omitted).

Factors for evaluating whether an expert's scientific testimony is reliable include: (i) whether a theory or technique can be tested, (ii) whether it has been subject to peer review and publication, (iii) the known or potential rate of error, and (iv) whether such a theory or method has achieved "general acceptance" in the scientific community. *Daubert*, 509 U.S. at 593-594. Other factors helpful in identifying whether evidence is sufficiently reliable are: (i) whether an expert is offering opinions arising out of research conducted independent of the litigation, or developed expressly for purposes of testifying, *see Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1317 (9th Cir. 1995); (ii) whether an

expert unfairly extrapolates from an accepted premise to an unfounded conclusion, *see General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); (iii) whether an expert adequately accounts for obvious alternative explanations, *see Claar v. Burlington N.R.R.*, 29 F.3d 499, 502-503 (9th Cir. 1994); (iv) whether an expert 'is being as careful as he would be in his regular professional work outside his paid litigation consulting[,]" *see Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997); and (v) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give, *see Kumho Tire*, 526 U.S. at 150.  Advisory Committee Notes to Fed. R. Evid. 702, 2000 Amendments.  These lists are not exclusive, as the Supreme Court reiterated in *Kumho Tire*: "[W]e can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert*, nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence . . . the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [her] testimony."  526 U.S. at 150 [internal quotation omitted].  Further, the Tenth Circuit has stated that "the reliability criteria enunciated in *Daubert* are not to be applied woodenly in all circumstances."  *United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009).

## II.    THE GOVERNMENT'S PROPOSED EXPERT WITNESSES

The Government identifies **seven expert witnesses** who will testify at trial against the Defendant in this case, noting that they will each serve as both fact and expert witnesses at trial:  Dr. Mary Stockett, Dr. Laura Bode, Dr. Matthew Misner, Dr. Shawna Duncan, Dr.

Marilyn Steele, Dr. Anne Chun-Hui Tsai, and Ms. Tyra Sweet, RN. *See* Docket No. 104. While the Defendant objected to most of these witnesses testifying as experts, the Defendant has now withdrawn its objections as to two, **pediatric geneticist Dr. Anne Chun-Hui Tsai and pediatric gastroenterologist Dr. Marilyn Steele**.

### A.    Dr. Anne Chun-Hui Tsai.

Dr. Tsai testified at the *Daubert* hearing, but the Defendant raises no challenge to her qualifications or to the reliability or relevance of her testimony, and indeed characterizes her as a witness "whose qualifications are beyond reproach." *See* Docket No. 178, p. 8. The undersigned Magistrate Judge agrees and therefore finds that Dr. Tsai is qualified to provide expert testimony as a pediatric geneticist and that her testimony would be both reliable and relevant, and therefore that her testimony should not be excluded.

### B.    Dr. Marilyn Steele.

As to Dr. Steele, the Defendant originally complained that the Government had failed to provide Dr. Steele's curriculum vitae ("CV") even a month after providing notice of Dr. Steele as an expert. While providing no basis for the delay, the Government indicates that Dr. Steele's CV was eventually produced on July 14, 2022. *See* Docket No. 143, p. 26 n.5. As the Defendant raised no further challenges to the admissibility of her testimony and the CV was provided well in advance of the *Daubert* hearing, the undersigned Magistrate Judge likewise finds no prejudice in the Government's delay in providing proper notice as to Dr. Steele, and that she should therefore be permitted to testify

as an expert at trial as she is well qualified and her testimony would be both reliable and relevant.

### C.    Treating Physicians Dr. Shawna Duncan, Dr. Matthew Misner & Dr. Laura Bode.

The undersigned Magistrate Judge turns to the next three proposed experts, physicians who treated G.Y. between 2014 and 2018: **Dr. Shawna Duncan, Dr. Matthew Misner, and Dr. Laura Bode**.  Treating physicians are often referred to as hybrid fact/expert witnesses, given the combined nature of their experiences treating a person along with their possession of training and skills necessary for being a physician.  "Both Federal Rules of Evidence 701 and 702 distinguish between expert and lay testimony, not between expert and lay witnesses.  Indeed, it is possible for the same witness to provide both lay and expert testimony in a single case." *United States v. Caballero*, 277 F.3d 1235, 1247 (10th Cir. 2002) (citation and footnotes omitted).  For instance, "a treating physician still acts as a lay witness [for purposes of the Federal Rules of Evidence] when testifying to his treating or caring for a patient." *Walker v. Spina*, 2019 WL 145626, at \*19 (D.N.M. Jan. 9, 2019) (citation omitted).  However, "a treating physician testifying **as a lay witness** cannot testify to medical opinions regarding causation, because such opinions require knowledge derived from previous professional experience[, which] falls squarely within the scope of Rule 702 and thus by definition outside of Rule 701." *Spina*, 2019 WL 145626, at \*21 (emphasis added).  "A treating physician's opinions regarding diagnosis of a medical condition is almost always expert testimony, because diagnosis requires judgment based on scientific, technical, or specialized knowledge in almost every case[.]

-8-

Diagnosing that a patient suffers from a complicated medical condition is expert testimony[.]" *Montoya v. Sheldon*, 286 F.R.D. 602, 614 (D. N.M. 2012).

In contrast, "[t]he credibility of witnesses is generally not an appropriate subject for expert testimony." *United States v. Toledo,* 985 F.2d 1462, 1470 (10th Cir. 1993). *See also United States v. Hill*, 749 F.3d 1250, 1263 (10th Cir. 2014) ("[O]ur court has clearly held that 'credibility [i]s for determination by the jury,' and '[a]n expert may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility[.]'") (*quoting United States v. Samara,* 643 F.2d 701, 705 (10th Cir. 1981) (quotation omitted)). And this applies to expert testimony as to the credibility (or lack thereof) of a defendant as well. *See Hill*, 749 F.3d at 1260-1261 ("[T]he government argues that the foregoing Tenth Circuit cases establish a rule that it is impermissible for an expert to vouch *for* the credibility of a witness, but say nothing about an expert's opinion that a defendant is *not* credible. We disagree."). Moreover, "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b).

### 1.    Dr. Shawna Duncan.

The Defendant does not dispute Dr. Duncan's qualifications. She is a board-certified pediatrician with twenty years of experience. She is also a professor of pediatrics at the Oklahoma State University College of Osteopathic Medicine at the Cherokee Nation, and worked as a pediatric hospitalist at Saint Francis Hospital in Tulsa, Oklahoma when

she treated G.Y. While also noting that the Defendant offers no objections to her qualifications, the undersigned Magistrate Judge finds she possesses specialized knowledge, skill, experience, training, and education and should be accepted as qualified by this Court as an expert. Additionally, her testimony as a physician who treated G.Y. during the time period covered by the indictment is clearly relevant to this case of alleged medical child abuse and medical child neglect.

Dr. Duncan was the attending physician for G.Y. for six admissions to Saint Francis Hospital between July 2014 and July 2018. *See* Hr'g Ex. 4.1. Dr. Duncan specifically testified about being the attending for G.Y. in December 2017 and again in July 2018. Hr'g Tr. 299-301. At the July 2018 admission, she performed a physical examination of G.Y. She testified at the *Daubert* hearing that G.Y. did not have a terminal illness at that time and that none of his illnesses were terminal. *Id.* at 304-305. Progress notes written by a resident and attested to by Dr. Duncan state, *inter alia*, "Mom expresses she is ready to take him home and put him back on hospice. I have discussed with her that I do not feel [G.Y.] is in such poor health that he needs hospice." Hr'g Ex. 4.6, p. 17743. Dr. Duncan also testified that G.Y.'s symptoms did not appear to match a mitochondrial disorder because he did not have frequent seizures or lose the ability to speak or hear, which are typical of such disorders. Hr'g Tr. 308. She further opined that hospice was for terminal patients with less than six months to live, and not for pain management. *Id.* at 308-309.

Dr. Duncan testified that placing patients on hospice care was part of her overall education, and she would only ever refer a child for hospice if they had a terminal illness

and less than six months to live. *Id.* at 309. Specifically, she testified that she never recommended G.Y. for hospice care. *Id.* at 310. Further, Dr. Duncan testified that she did not understand why G.Y. was in a wheelchair because she saw G.Y. appear to be mobile, including up and out of his wheelchair, and he had a normal musculoskeletal exam. *Id.* at 317-318. Dr. Duncan indicated that she had never found G.Y. to have anything like dislocated hips, and pointed out treatment notes from an orthopedist who had prescribed the wheelchair for G.Y. due to deconditioning. *Id.* at 319.

Sometime prior to December 2014, G.Y. had been fitted with a g-tube for feedings. During G.Y.'s December 2014 admission, he developed diarrhea due to antibiotics for the flu, so the g-tube feedings were stopped because of G.Y.'s diarrhea and he was placed on TPN[1] (a method of feeding through a vein that bypasses the gastrointestinal tract) because he was not meeting his goal feeds. Hr'g Ex. 4.8, p. 1951. G.Y. was discharged from the hospital while still on TPN feeds on January 16, 2015. *Id.* at 1949. Upon discharge, Dr. Duncan referred G.Y. to Dr. Misner with the goal of getting G.Y. off TPN. Hr'g Tr. 326. She testified that he remained on TPN at discharge because he had still not met his feeding goals. *Id.* At 343. Dr. Duncan testified that she did not know how long G.Y. remained on TPN after his January 2015 discharge, but that he was on TPN in July 2018 when he came in and had been on it during two intervening admissions as well. *Id* at 339-340. Dr. Duncan testified that she concluded removal of TPN was delayed based on the fact that G.Y. had

---

[1] Dr. Misner provided a more extensive description of TPN and its administration at the *Daubert* hearing. *See* Hr'g Tr. 88-90.

systemic signs and symptoms of end organ damage from consistent TPN use when he was remitted to Saint Francis in July 2018.  *Id.* At 341.

G.Y. was admitted to Saint Francis on July 4, 2018, and Dr. Duncan served as his attending physician. "H&P Notes" typed by a resident and attested to by Dr. Duncan indicate that the Defendant had taken G.Y. to the hospital because hospice had stopped most of G.Y.'s medications and referred her to DHS with concerns of Munchausen Syndrome by proxy.  *See* Hr'g. Ex. 4.5, p. 17725.  At the time, the Defendant told Dr. Duncan that an oncologist, Dr. Mohammed, had recommended hospice for G.Y. and that a Dr. Gaston had agreed and ordered it.  However, the medical record from Saint Francis Children's Hospital reflects that Dr. Gaston denied ordering hospice.  *Id.*  At the hearing, Dr. Duncan also testified that she had spoken with Dr. Mohammed at the time and that he also denied ordering hospice, but that she could not find that conversation reflected in her treatment notes.  Hr'g Tr. 330.

Although she does not object to Dr. Duncan's qualifications, the Defendant objects to the admission of certain opinions from Dr. Duncan proffered at the *Daubert* hearing. During the course of the hearing with each expert, the Government would supply an opinion by prefacing a question with, "[i]s it your opinion that . . ." and supplying the opinion desired from the witness.  See, *e.g.*, H'rg Tr. pp. 304, 308, 310 326.  In this way,

the Government elicited seven opinions from Dr. Duncan, six of which the Defendant now challenges.[2]  The Defendant challenges the following opinions from Dr. Duncan:

(i) G.Y. did not have a terminal illness prior to July 2018;

(ii) G.Y.'s symptoms did not fit a mitochondrial disease;

(iii) hospice is only recommended for terminal patients and not for pain management;

(iv) the Defendant was portraying G.Y. as sicker than he was;

(v) that many of G.Y.'s symptoms were based on his unnecessary TPN dependency; and

(vi) that no natural disease could explain G.Y's illnesses and sudden recovery.

The Government now concedes that there is insufficient evidence to support Dr. Duncan's opinion (ii) that G.Y.'s symptoms did not fit a mitochondrial disease, so the undersigned Magistrate Judge now proceeds to address the remaining five opinions.

"The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury." *United States v. Chapman*, 59 F. Supp. 3d 1194, 1211 (D. N.M. 2014), *affirmed,* 839 F.3d 1232 (10th Cir. 2016) (citation omitted).  Fed. R. Evid. 703 instructs that "[a]n expert may base an opinion on facts or data in the case that the expert has been

---

[2] The Defendant does not challenge Dr. Duncan's opinion that G.Y. could tolerate g-tube feeds. *See* Docket No. 178, pp. 7-14.  *See also* H'rg Tr. 326.

made aware of *or* personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." (emphasis added).  "Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."  *Daubert*, 509 U.S. at 592 (*citing* Rules 701, 702, and 703).  "*Daubert* generally does not, however, regulate the underlying facts or data that an expert relies on when forming her opinion."  *United States v. Lauder*, 409 F.3d 1254, 1264 & n.5 (10th Cir. 2005).

Under Fed. R. Crim. P. 16, the Government was not required to submit an expert report detailing Dr. Duncan's (or any other expert's) methodology.  At the *Daubert* hearing, Dr. Duncan testified that she based her opinions on multiple encounters with G.Y., conversations with the parties involved, and review of the reports and care of other physicians at the time.  This "methodology," in combination with her "unchallenged experience," is sufficient to determine that the following of Dr. Duncan's opinions are reliable:  (i) G.Y. did not have a terminal illness prior to July 2018, (iii) hospice is only recommended for terminal patients and not for pain management, and (v) that many of G.Y.'s symptoms were based on his unnecessary TPN dependency.  *See United States v. Woods*, 2022 WL 989477, at *3 (N.D. Okla. April 1, 2022) ("The Government states in its

Rule 16 notice that Dr. Hines based her opinions on examination of the victim in a medical setting, interviews with the parties involved in the incident leading to medical intervention, and review of the reports and care of other physicians involved in the treatment of the victim. This description of Dr. Hines' methodology in combination with her unchallenged experience in child abuse medicine is sufficient for the Court to exercise its gatekeeping function and determine that Dr. Hines' testimony is reliable enough to present to the jury."). "In other words[,] when experts employ established methods in their usual manner, a district court need not take issue under *Daubert;* however, where established methods are employed in new ways, a district court may require further indications of reliability." *Attorney Gen. of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 780 (10th Cir. 2009). And as the Court pointed out in *Woods*, the Defendant is entitled to cross-examine Dr. Duncan as to her examinations, methodology, and analysis. *Woods*, 2022 WL 989477, at *3 (N.D. Okla. April 1, 2022) ("Defendant may cross-examine Dr. Hines on the specifics of her examination and analysis."). *See also Gutierrez de Lopez*, 761 F.3d at 1136 ("Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions. The jury is intelligent enough to ignore what is unhelpful in its deliberations.").

Even if it is reliable and relevant, however, the Court must nevertheless also keep in mind that it "may exclude relevant evidence if its probative value is substantially outweighed by danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative

evidence." Fed. R. Evid. 403. The undersigned Magistrate Judge finds here that Dr. Duncan's opinions (i), (iii), and (v) are admissible under Rule 702, and further finds that their probative value is not substantially outweighed by any danger of unfair prejudice. Dr. Duncan's testimony has significant probative value, and any danger of unfair prejudice or confusion can be "ameliorated" with a jury instruction. *See, e.g.*, *United States v. Chapman*, 839 F.3d 1232, 1240 (10th Cir. 2016) ("Further, the trial court ameliorated any unfair prejudice or confusion by instructing jurors that they were not required to accept Nurse Starr's testimony, but should treat it as any other testimony and give it only the weight jurors thought it deserved.").

As to Dr. Duncan's proposed opinion (vi), that no natural disease could explain G.Y's illnesses and sudden recovery, the undersigned Magistrate Judge finds it should be excluded. The Government concedes that there is insufficient evidence to support Dr. Duncan's opinion (ii), that G.Y.'s symptoms did not "fit" a mitochondrial disorder. As argument (ii) is subsumed within the larger argument of (vi), the undersigned Magistrate Judge finds that Dr. Duncan provides insufficient evidence to support the opinion that there is not any possible natural disease that could explain G.Y.'s illnesses and sudden recovery.

Finally, as to Dr. Duncan's remaining opinion—(iv), that the Defendant was portraying G.Y. as sicker than he was—the undersigned Magistrate Judge finds it should be excluded. The Defendant contends that this opinion is unreliable because it is based on recollections of conversations or events not contained in the record, while the Government contends that her recollections are only a small part of the basis for her opinion and are

therefore reliable. Reliable or not, the undersigned Magistrate Judge finds that this opinion improperly invades the province of the jury as to the Defendant's credibility. *See Toledo*, 985 F.2d at 1470 ("Many courts exclude expert testimony on the credibility of other witnesses because it usurps a critical function of the jury.") (citations omitted). *See also Hill*, 749 F.3d at 1260-1261. Keeping in mind the hybrid fact/expert nature of Dr. Duncan's testimony, the undersigned Magistrate Judge notes that Dr. Duncan may nevertheless testify with no prohibition as to the *facts underlying* this, or any other, opinion based on her treatment relationship with G.Y., such as his December 2014 hospitalization and findings related to his lungs, her observations about G.Y. being in a wheelchair but also able to move around the room, her lack of findings related to hip problems (and supporting treatment notes from other physicians that she reviewed at the time), and her experience with trying to return G.Y. to g-tube feedings. *See Davoll v. Webb*, 194 F.3d 1116, 1138 (10th Cir. 1999) ("A treating physician is not considered an expert witness if he or she testifies about observations based on personal knowledge, including the treatment of the party.").

Accordingly, Dr. Duncan should be permitted to testify as to the following opinions: (i) G.Y. did not have a terminal illness prior to July 2018, (iii) hospice is only recommended for terminal patients and not for pain management, and (v) that many of G.Y.'s symptoms were based on his unnecessary TPN dependency, but *not* as to opinions (iv) that the Defendant was portraying G.Y. as sicker than he was, and (vi) that no natural disease could

explain G.Y's illnesses and sudden recovery, in addition to the already-excluded opinion (ii) that G.Y.'s symptoms did not fit a mitochondrial disease.

### 2. Dr. Matthew Misner.

The Defendant does not dispute Dr. Misner's qualifications. He is board certified by the American Osteopathic Board of Pediatrics and a long-time member of the American Academy of Pediatrics and has been a pediatrician over twelve years. He is currently a pediatric palliative care and hospice physician, but also keeps his general pediatric certification. Because the Defendant offers no objections to his qualifications, the undersigned Magistrate Judge finds he possesses specialized knowledge, skill, experience, training, and education and should be accepted as qualified by this Court as an expert. Moreover, Dr. Misner's opinion is relevant to three counts of the eight-count indictment, Counts Five, Six, and Seven, which encompass the time frame that he treated G.Y. [Docket No. 2].

Dr. Misner encountered G.Y. in January 2015 while he was working at the Warren Clinic in Muskogee, Oklahoma, after receiving a referral from Dr. Duncan upon G.Y.'s January 2015 discharge from Saint Francis Children's Hospital. Hr'g. Tr. 60. Dr. Misner testified that he primarily saw G.Y. on January 30, 2015 to establish a pediatric relationship, but also with the specific goal of getting G.Y. off TPN. *Id.* at 62. Dr. Misner only saw G.Y. at this one visit on January 30, 2015, but he continued to manage G.Y.'s TPN for several weeks thereafter. *See* Hr'g Exs. 2.1, 2.2, 2.4. He also referred G.Y. to a gastroenterologist. *See* Hr'g Exs. 2.1, 2.2. At the time, Dr. Misner observed G.Y. with a

nasal cannula attached to an oxygen tank, that he was in a wheelchair, and that he had a g-tube in his abdomen. Hr'g Tr. 63-64. At the examination, Dr. Misner took a history, noting that G.Y. had not been tolerating g-tube feeds and had therefore been placed on a combination of minimal g-tube and largely TPN feedings. *Id.* at 67-68. He stated that he then performed a full physical examination of G.Y., from head to toe. *Id.* at 74-80. Dr. Misner testified that he attempted to examine G.Y. out of the wheelchair, but that the Defendant said that he could not stand or bear weight and that G.Y. was therefore returned to the wheelchair to complete the exam. *Id.* at 75. In summarizing his findings, Dr. Misner stated, "So what I had was a completely normal exam, minus the nasal cannula, minus the G-tube in his stomach, and I had a child who was also eager to interact, too." *Id.* at 77:22-25. Dr. Misner indicated that the Defendant was aware at this appointment that the goal was for G.Y. to get off TPN. *Id.* at 94.

Dr. Misner also testified that after the appointment, he contacted Dr. Duncan to ask whether G.Y. needed the nasal cannula or the wheelchair, as well as a pediatric pulmonologist, Dr. Droemer, to ask about the oxygen. Dr. Misner relayed that Dr. Droemer did not think G.Y. needed oxygen but that the Defendant had advocated for it several times. Dr. Misner seemed to conclude that G.Y. had been prescribed the oxygen as a way to "treat the parent," rather than the patient, because oxygen at that level was "not going to be that detrimental." *Id.* at 81-82.

Dr. Misner testified that he also made a referral to a GI specialist, Dr. Pulipati. *Id.* at 83-84. As part of this referral, he testified that he walked over to Dr. Pulipati's office to

make the appointment, and then confirmed with the Defendant that it was an acceptable appointment time. *Id.* at 95. Indeed, Dr. Misner testified that he attempted to set up three appointments for G.Y. with Dr. Pulipati, but the Defendant never took him to those appointments. *Id.* at 95-98. Additionally, he stated that he spoke with the Defendant about getting G.Y. to Dr. Pulipati, and the Defendant told him she had contacted Dr. Pulipati and made an appointment but that he then discovered there had been no contact and no appointment. *Id.* at 98. On February 11, 2015, Dr. Misner authored an order for decreasing G.Y.'s TPN feed and increasing his g-tube feed. Hr'g Ex. 2.4. Despite the decrease being ordered, Dr. Misner discovered that the TPN had not been decreased. Hr'g Tr. 99.

These experiences regarding the GI referral and failure to decrease G.Y.'s TPN feeds led Dr. Misner to have enough concerns that he contacted Child Protective Services ("CPS") on February 12, 2015. *Id.* at 101-102. *See also* Hr'g Ex. 2.5. However, on February 26, 2015, Dr. Misner received a fax from Preferred Pediatric Home Health Care stating that G.Y. was off TPN and his port had been deaccessed. Hr'g. Ex. 2.6. Dr. Misner testified that he had made a follow-up appointment with G.Y. for February 27, 2015, but G.Y. never returned. Hr'g Tr. 130.

On cross-examination, the Defendant's counsel asked Dr. Misner about his CPS referral, and Dr. Misner clarified that he was not sure the Defendant was lying, but that he had a "gut feeling" or a "sixth sense" that "something was not right." Hr'g Tr. 127-128. He then agreed when Defendant's counsel asked him if his gut assisted him in his determination that the Defendant portrayed G.Y. as sicker than he was, and in being

concerned about G.Y.'s TPN and Defendant's reluctance to reduce it. *Id.* at 128-129. On re-direct, Dr. Misner clarified that his "sixth sense" did not run him, and that his examination and supportive information alone did not trigger any alarms; rather, it was the Defendant's reluctance to return to him and the reluctance to see the GI specialist that caused concerns about G.Y. continuing on the TPN and caused him to contact CPS. *Id.* at 136.

The Government proffered a series of five[3] opinions on behalf of Dr. Misner at the *Daubert* hearing: (i) that G.Y. did not need oxygen during Dr. Misner's care; (ii) that G.Y. did not need a wheelchair during his care; (iii) that G.Y. did not need TPN during his care; (iv)(a) that TPN should have been removed as soon as possible and (b) that the Defendant unnecessarily delayed the removal of TPN by failing to follow up with a gastroenterologist in a timely manner; and (v) that the Defendant was portraying G.Y. to be sicker than he was. *See* Hr'g Tr. 104-105.

The Defendant contends that Dr. Misner's first three opinions, *i.e.*, (i) that G.Y. did not need oxygen, (ii) a wheelchair, or (iii) TPN during Dr. Misner's treatment, are not based on a significant enough treatment relationship to base an opinion and further, that limiting his opinion only to the time period Dr. Misner treated G.Y. is "utterly irrelevant and unhelpful to a trier of fact." Here, Dr. Misner testified that he based his opinions on

---

[3] The Defendant asserts that Dr. Misner proffered six opinions, *see* Docket No. 178, p. 14, but only five are identified as challenged within the briefing and the *Daubert* hearing transcript, *see* Hr'g Tr. pp. 104-105.

-21-

his encounter with and physical examination of G.Y., conversations with the Defendant and Dr. Duncan (including conversations reflecting that Dr. Duncan's explicit goal in referring G.Y. to Dr. Misner was to get G.Y. off TPN), and a review of the reports and care of other physicians at the time. This "methodology," in combination with Dr. Misner's substantial experience as a pediatrician and pediatric hospice care physician is sufficient to determine that the following of Dr. Misner's opinions are reliable as to the time frame to which they are applicable: (i) that G.Y. did not need oxygen during Dr. Misner's care, (ii) that G.Y. did not need a wheelchair during his care, and (iii) that G.Y. did not need TPN during his care. Additionally, and for the same reasons, the undersigned Magistrate Judge finds that Dr. Misner's expert opinion is relevant and reliable as to (iv)(a) that TPN should have been removed as soon as possible. *See Woods*, 2022 WL 989477, at *3. "[W]hen experts employ established methods in their usual manner, a district court need not take issue under *Daubert;* however, where established methods are employed in new ways, a district court may require further indications of reliability." *Tyson Foods, Inc.*, 565 F.3d at 780. As with Dr. Duncan, the Defendant is entitled to cross-examine Dr. Misner as to his examinations, methodology, and analysis, but he should be permitted to offer these opinions. *Woods*, 2022 WL 989477, at *3. *See also Gutierrez de Lopez*, 761 F.3d at 1136 ("Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions. The jury is intelligent enough to ignore what is unhelpful in its deliberations.").

The undersigned Magistrate Judge thus finds that Dr. Misner's opinions (i), (ii), (iii), and (iv)(a) are admissible under Rule 702, and further finds that their probative value is not substantially outweighed by any danger of unfair prejudice.  Dr. Misner's testimony has significant probative value, and, as with Dr. Duncan, any danger of unfair prejudice or confusion can be "ameliorated" with a jury instruction.  *See, e.g.*, *Chapman*, 839 F.3d at 1240.

As to Dr. Misner's remaining two opinions—(iv)(b) that the Defendant unnecessarily delayed the removal of TPN by failing to follow up with a gastroenterologist in a timely manner and (v) that the Defendant was portraying G.Y. to be sicker than he was—the Defendant objects to their admission by asserting that Dr. Misner's opinions are based on nothing more than a "gut feeling" and recollections of conversation from seven years ago.  While the undersigned Magistrate Judge agrees that experts may not base their opinions on "gut instinct," *see Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 667 (N.D. Ill. 2006) ("Even in instances where a formal scientific method is not necessary, a purported expert must consider obviously relevant information in forming his opinion. Put somewhat differently, such supposed "expert" testimony cannot be a hunch or a gut feeling—it must be based on some specific data.") (citations omitted), here, Dr. Misner's opinion was based on his extensive professional experience and he testified as to the methodology he applied in examining G.Y, *see Duininck Bros. v. Howe Precast, Inc.*, 2008 WL 4394668, at *3 (E.D. Tex. Sept. 22, 2008) ("The court interprets Stradley's references to personal rules of thumb and gut instincts as perhaps a means of describing reliance on

his professional experience."). Because we have sufficient testimony as to methodology, the undersigned Magistrate Judge find that these opinions are not based only on an impermissible "gut feeling." *In RE: Epipen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation*, 2021 WL 2577490, at *55 n.28 (D. Kan. June 23, 2021). ("Defendants argue that this testimony shows that Prof. Torrance bases his opinions only on his comfort level and gut feelings which isn't a reliable methodology for rendering expert testimony. But, in the larger context of this deposition testimony, Prof. Torrance explained his methodology[.] And, as he testified, it's based on a methodology that isn't just a gut feeling or comfort level, as defendants describe it."). "It will be up to the jury to decide whether the testimony, and the various bases for the testimony, should be credited." *Allied Erecting & Dismantling Co. v. U.S. Steel Corp.*, 2015 WL 1530648, at *13 (N.D. Ohio Apr. 6, 2015).

Although Dr. Misner's final two opinions may be reliable, they nevertheless raise concerns to the extent they invade the province of the jury. Where Dr. Misner opines that the Defendant caused unnecessary delays in G.Y.'s treatment and unnecessarily portrayed G.Y. as sicker than he was, such opinions improperly opine on the Defendant's credibility. *See Toledo*, 985 F.2d at 1470; *Hill*, 749 F.3d at 1260-1261. Nonetheless, Dr. Misner may certainly testify as to his treating relationship with G.Y., including his repeated attempts to schedule G.Y. an appointment with a gastroenterologist, his orders regarding decreasing G.Y.'s TPN feeds and increasing his g-tube feeds, and that he had sufficient concerns to warrant contacting CPS. *See Davoll*, 194 F.3d at 1138.

The undersigned Magistrate Judge thus finds that Dr. Misner is qualified as an expert as well as fact witness in this case, that his testimony is both reliable and relevant, and that he should be permitted to testify as an expert as to the following opinions: (i) that G.Y. did not need oxygen during Dr. Misner's care, (ii) that G.Y. did not need a wheelchair during his care, (iii) that G.Y. did not need TPN during his care, and (iv)(a) that TPN should have been removed as soon as possible. He should not, however, be permitted to testify as to the remaining proposed opinions: (iv)(b) that the Defendant unnecessarily delayed the removal of TPN by failing to follow up with a gastroenterologist in a timely manner and (v) that the Defendant was portraying G.Y. to be sicker than he was.

### 3.    Dr. Laura Bode.

The Defendant does not challenge Dr. Bode's qualifications. She has been a pediatrician since 2014, and currently serves as a pediatric hospitalist and clinical associate professor for the Oklahoma State University Center for Health Sciences Department of Pediatrics. Hr'g Ex. 3.0. Because the Defendant offers no objections to her qualifications, the undersigned Magistrate Judge finds she possesses specialized knowledge, skill, experience, training and education and should be accepted as qualified by this Court as an expert. At the *Daubert* hearing, Dr. Bode testified that she was G.Y.'s admitting physician for numerous hospital admissions from 2015 through 2018. Hr'g Tr. 224. *See also* Hr'g Ex. 3.1 (documenting eighteen inpatient admissions). The undersigned Magistrate Judge therefore also finds that her testimony is relevant, as she treated G.Y. multiple times in the time period covered by the Indictment. *See* Docket No. 2.

-25-

Dr. Bode testified that throughout the relevant time period in this case, she recalled multiple instances where the Defendant would increase G.Y.'s oxygen rates by adjusting the dial during his hospital stays and that there were times the Defendant would either turn off or turn down his g-tube feeds. Hr'g Tr. 239-240, 267-273. Dr. Bode was the attending physician when G.Y. was admitted to Saint Francis Children's Hospital in Tulsa Oklahoma from October 14, 2015, until he was discharged on October 22, 2015. An October 20, 2015 Progress Note completed by a resident but attested to by attending physician Dr. Binh Phung, D.O. noted moderate to severe diffuse intestinal distention throughout the abdomen, and recommended an assessment by pediatric surgery. Additionally, the Progress Note states, "Nutritionist has recommended a new feeding regimen: Neocate Jr. trophic feeds start at 5ml/hr, then increase up by 5 every 3 hours until can reach goal of 65ml/kg maintain gut integrity, goal is to get to 65ml/hr." Hr'g Ex. 3.12, p. 3393. A note authored by resident Christel Dixon at 9:02 p.m. indicates that she discussed the results of testing with the Defendant along with the plan to restart G.Y. on feeds of Neocate Jr with increases, and that the Defendant "voiced understanding and agreement with the plan." Hr'g Ex. 3.12, p. 3400. However, the treatment record also includes a subjective portion just a few pages earlier in which the Defendant "report[ed] that nutrition 'recommended against feeding and thought he may never reach full feeds ever again. When confronted that nutrition's report did not match [Defendant's, she] again states that nutrition did NOT want feeds started yet." *Id.* at p. 3394. That same note reflects that the Defendant reported that G.Y. had

been in pain overnight, then changed her statement to indicate that a nurse told her G.Y. had been in pain overnight because she was asleep. *Id.*

Two other hospital admissions occurred in March 2018 and April 2018. *See* Hr'g Ex. 3.1. The Government offered the records containing the labs, test orders and exams from these admissions. *See* Hr'g Exs. 3.4, 3.5, 3.6. Additionally, the Government provided medical treatment notes from G.Y.'s hospital admission from April 2, 2018 through April 8, 2018. A treatment note from Dr. Kimberly Martin, D.O. on April 3, 2018 states that G.Y.'s pain should be managed by his PCP, and that he should not receive IV narcotics at home. Hr'g Ex. 3.8, p. 17038. When asked, Dr. Bode offered her opinion that G.Y. did not have a terminal illness in April 2018. Hr'g Tr. 227, 231. She also opined that G.Y. should not have been on hospice care at that time. *Id.* at 233. Dr. Bode testified that, during the April 2018 visit, child life specialist Kelly Kempe approached her with concerns that the Defendant was escalating behaviors and seemed hyper focused on seeking pain management for G.Y., although Dr. Bode had not observed pain during her exams. *Id.* at 234-236. At that time, the Defendant wanted G.Y. to be discharged to hospice so she could return to work, but the doctors recommended that he stay for further evaluation. *Id.* at 240-241. However, Dr. Bode did not characterize this as leaving against medical advice, but as shared decision-making with the family even though it went against her recommendation. *Id.* at 260-261. Doctors recommended that G.Y. be transferred to another facility, but the Defendant declined a transfer. *Id.* at 241. The discharge note signed by Dr. Binh Thai Phung, D.O. on April 8, 2018 indicates that the Defendant had

raised concerns regarding G.Y.'s pain management, and that the Defendant had been told she needed to initiate an outpatient referral to Ped Pain Management. The note also indicated that G.Y. himself had not complained of any pain while admitted. Hr'g Ex. 3.7, pp. 17063, 17073-17074.

When asked whether the Defendant requested invasive procedures that G.Y. did not need, Dr. Bode agreed that she did, and provided an example of requesting a second bone marrow biopsy to (again) rule out cancer. *Id.* at 245. On cross-examination, Dr. Bode agreed that another oncologist, Dr. Hum, had deemed a bone marrow biopsy appropriate in April 2018, and that he would not have done one "solely" at Defendant's request. *Id.* at 266-267.

Dr. Bode then saw G.Y. during his July 2018 admission and testified that his condition was not terminal at that time. *Id.* at 238, Hr'g Ex. 3.10, p. 17778. And while treatment records from that time reflect that the Defendant indicated that G.Y. had recently come off hospice care, the Defendant had attributed hospice care to pain management rather than a terminal illness. Hr'g Tr. 288; Hr'g Ex. 17779. Additionally, noting that G.Y. improved "dramatically" after being removed from the Defendant's care, Dr. Bode testified that this improvement called into question the previous procedures that had been ordered for him. Hr'g Tr. 291.

The Defendant objects to three of the opinions offered by Dr. Bode: (i)(a) that the Defendant caused G.Y. to stay ill, (b) by repeatedly seeking unnecessary medical treatment and (c) dictating the medical treatment he received; (ii)(a) that the Defendant dictated

medical care that G.Y. was receiving (b) based on inaccurate information she was providing to physicians; and (iii) that the Defendant requested invasive procedures that were not necessary. *See* Hr'g Tr. 238-239, 242, 245. In essence, while the Defendant challenges the sufficiency of the evidence of all three opinions, the Government's response focuses on the medical records submitted at the hearing that go to support her opinions, including records related to the nutritionist consultation and the Defendant adjusting G.Y.'s g-tube feed and oxygen levels.

The undersigned Magistrate Judge finds that the following portion of Dr. Bode's opinions are reliable and should be permitted as expert testimony: that the Defendant (i)(b) repeatedly sought unnecessary medical treatment, (ii)(b) provided inaccurate information to physicians, and (iii) requested invasive procedures that were not necessary. Dr. Bode testified as to her treatment relationship with G.Y., including lab tests and results that she ordered and/or used in her assessments at the time, as well as her education, experience, and treating relationship with both G.Y. and the Defendant. This combination is sufficient to find her opinions are reliable. *See Woods*, 2022 WL 989477, at *3; *Tyson Foods, Inc.*, 565 F.3d at 780. As with Dr. Duncan and Dr. Misner, the Defendant may cross-examine Dr. Bode as to her specific examinations, methodology, and analysis, but she should be permitted to offer these opinions. *Woods*, 2022 WL 989477, at *3 (N.D. Okla. April 1, 2022). *See also Gutierrez de Lopez*, 761 F.3d at 1136.

Moreover, the undersigned Magistrate Judge finds that Dr. Bode's opinions that the Defendant: (i)(b) repeatedly sought unnecessary medical treatment, (ii)(b) provided

inaccurate information to physicians, and (iii) requested invasive procedures that were not necessary, are admissible under Rule 702, and further finds that their probative value is not substantially outweighed by any danger of unfair prejudice. Dr. Bode's testimony has significant probative value, and, as with Dr. Duncan and Dr. Misner, any danger of unfair prejudice or confusion can be "ameliorated" with a jury instruction. *See, e.g.*, *Chapman*, 839 F.3d at 1240.

The remainder of Dr. Bode's opinions—(i)(a) that the Defendant caused G.Y. to stay ill and (c) dictated the medical treatment he received and (ii)(a) that the Defendant dictated medical care that G.Y. was receiving—are indicative of opinions that invade the province of the jury as they improperly opine on the Defendant's credibility. *See Toledo*, 985 F.2d at 1470; *Hill*, 749 F.3d at 1260-1261. As with Dr. Duncan and Dr. Misner, however, Dr. Bode is free to testify as a fact witness regarding her experiences treating G.Y. and the events surrounding those hospital admissions, including concerns regarding G.Y.'s oxygen levels, requests for tests she deemed unnecessary, and discrepancies between records from Nutrition and the Defendant's representation as recorded in the Treatment Notes. *See Davoll*, 194 F.3d at 1138.

The undersigned Magistrate Judge thus finds that Dr. Bode is qualified as an expert as well as fact witness in this case, that her testimony is both reliable and relevant, and that she should therefore be permitted to testify as an expert as to the following opinions: (i)(b) that the Defendant repeatedly sought unnecessary medical treatment for G.Y, (ii)(b) that the Defendant provided inaccurate information to physicians, and (iii) that the

Defendant requested invasive procedures that were not necessary. Dr. Bode should not, however, be permitted to testify as to her opinion that: (i)(a) that the Defendant caused G.Y. to stay ill [by] (c) dictating the medical treatment he received and (ii)(a) that the Defendant dictated the medical care that G.Y. received.

### D.    Nurse Tyra Sweet.

Ms. Sweet has been a Registered Nurse ("RN") since 1990 and has worked as a forensic nurse in the Oklahoma Department of Human Services ("DHS") in the child welfare division for the past seven years. She earned her Bachelor of Science in Nursing in 2014 from Oklahoma Wesleyan University and earned a Master of Science in Forensic Nursing in 2018. *See* Ex. 7. Ms. Sweet testified that she assists child welfare specialists with CPS investigations and helps foster parents take care of medically fragile children and with navigating the medical system for children who come into custody of DHS. *See* Hr'g Tr. 431. She further testified that all her experience over the past thirty-two years gave her knowledge about medications and their effects, but particularly her experience in oncology, cardiology, and the emergency room. *Id.* at 433.

Ms. Sweet testified that she was tasked with performing a medication review in G.Y.'s home as part of a DHS referral, and that her task was to look at and photograph the medical supplies and medications in the home and then compare those to the medical records to determine whether there was compliance with the physicians' treatment plans. *See* Hr'g Tr. 436-437, 454. On July 20, 2018, she accompanied a child welfare worker to G.Y.'s home, and prepared a report based on this contact. *See* Hr'g Ex. 7.2. Ms. Sweet

testified that she took photographs of the medications in the home, noting that there was "an overabundance of medical supplies, a hospital bed in the living room and the medications are in unlocked cabinets." Hr'g Ex. 7.2, p.1.  As part of her report, Ms. Sweet also spoke with the Defendant and reviewed medical records by other nurses and care providers.  *See* Hr'g Tr. 438.  At the *Daubert* hearing, the Government offered a set of copied photographs that Ms. Sweet represented were photographs she took of all the medications found in G.Y.'s home.  *See* Hr'g Ex. 7.3.  In addition to the photos on each page, Ms. Sweet added a description of most the medications, testifying that she found the medication descriptions in the manufacturer's guides, a Physicians' Desk Reference, or a Nursing Drug Handbook.  *See* Hr'g Tr. 439-440.  She testified that based on the medications in the home and her education and experience, there were discrepancies between the amount of medications in the home and the amount that should have been in the home; however, she did not initially specify what those discrepancies were. *Id.* at 442. Ms. Sweet also testified that she created a chronology of G.Y.'s medical history, which she provided to Dr. Mary Stockett to assist in Dr. Stockett's review that was being conducted around the same time.  *See* Hr'g Tr. 441; Hr'g Ex. 7.4.

On cross-examination, Ms. Sweet explained that she is not permitted to prescribe medications as a registered nurse and holds no license that would permit her to prescribe medications.  Hr'g Tr. 447.  She further testified that she concluded that misuse of unspecified medications caused the symptoms in G.Y., but that a doctor would be required to provide a diagnosis.  *Id.* at 456-457.  When asked what medications were misused, she

stated that there was Gabapentin unaccounted for, and that when the nurse in the home provided the medications and refused to use unopened containers on June 21, 2018, G.Y.'s condition improved. *Id.* at 458. However, she also testified that while she believed G.Y. improved after the nurse administered unopened medication, there could have been reasons other than the Defendant's actions that led to G.Y.'s improvement. *Id.* at 458-459.

The Government proffered one opinion on behalf of Ms. Sweet: that the Defendant's misuse of medications in the home likely caused the near-death experience of G.Y. The Defendant contends Ms. Sweet never explained how or why she held this opinion or which drugs in combination or lack thereof caused the near-death experience, and she offered no basis for why the Defendant was the alleged perpetrator and not anyone else around G.Y. with access to the medications. Additionally, the Defendant contends Ms. Sweet is unqualified to offer this opinion, and that she used no methodology to reach her conclusions.

The undersigned Magistrate Judge agrees that Ms. Sweet should not be considered qualified to offer her expert opinion in this case. The Government contends that Ms. Sweet is qualified because she was familiar with the medications in G.Y.'s home and has thirty-two years of experience administering medications and caring for patients, and a statement regarding the likelihood causing a symptom is not a diagnosis, but an opinion on causation. *See, e.g.*, *Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories*, 62 F. Supp. 2d 1186, 1195 (D. Kan. 1999) (two nurses testified as experts regarding training and experience specifically as to sodium chloride and the effect of any medication administration error).

-33-

*Dunham v. Rapelje*, 2016 WL 1182723, at *6 (E.D. Mich. Mar. 28, 2016) ("A registered nurse, Karen Smiley, testified as an expert about Petitioner's medications during and after his surgery. She stated that the [specific] sedatives and painkillers that he received would have still been in his system at the time of his police interview."). While Ms. Sweet has significant experience and a number of qualifications as a registered nurse, she is prohibited by law from administering medications herself without an order from a physician. *See United States v. Savage*, 2021 WL 7186266, at *3 n.4 (E.D. Okla. Nov. 29, 2021) (declining to find a registered nurse/nurse practitioner qualified as an expert regarding toxicology or pharmacology, despite being found qualified as an expert in SANE exams). *See also Smith v. Christus Health Ark-La-Tex*, 2011 WL 13217905, at *5 (E.D. Tex. Apr. 25, 2011) ("As a licensed registered nurse who is prohibited by law from administering medications without an order from a physician, Griffith lacks the qualifications to testify as to the nature of a medication's side effects in this instance.") (citation omitted).

Additionally, even if Ms. Sweet were qualified to testify as an expert nurse, her testimony provided no foundation for the opinion she offered and is therefore inadmissible. *See Newton v. Roche Lab'ys, Inc.*, 243 F. Supp. 2d 672, 676 (W.D. Tex. 2002) ("In making the reliability determination, the trial court should not require certainty, but the testimony must demonstrate that the opinions offered are more than speculation."). The Government asserts without support that Ms. Sweet did not need to testify as to each medication found in the home and each effect because her methodology and the bases for her opinions were established at the hearing. To the contrary, Ms. Sweet offered only general testimony that

doses of one medication (gabapentin) were unaccounted for and then noted her review of records from the hospice care provider that G.Y. had improved after the registered nurse with hospice refused to use the unopened container. She did not, however, provide any testimony as to the specific effect of additional doses of gabapentin and even admitted that G.Y.'s improvement could have been attributed to a reason other than the Defendant's actions or inactions being thwarted. Accordingly, the undersigned Magistrate Judge recommends that the Defendant's motion be granted as to Ms. Sweet's *expert* testimony. *See Funk v. Pinnacle Health Facilities XXXII., LP*, 353 F. Supp. 3d 1138, 1141-1142 (D. Kan. 2018) ("When presented with proposed expert testimony by nurses as to the causation of medical condition—other than bedsores—most courts have excluded it.") (collecting cases). Expert testimony notwithstanding, the undersigned Magistrate Judge notes that the Government may nevertheless call Ms. Sweet to testify as a fact witness in this case as to her involvement in investigating and preparing a report for DHS.

### E.    Dr. Mary Stockett.

Finally, the undersigned Magistrate Judge turns to Dr. Stockett. Her qualifications are not in dispute. She has been a pediatrician for thirty years and is board certified in child abuse pediatrics and pediatrics. Hr'g Tr. 259; Hr'g Ex. 1. She has testified as an expert over a hundred times and performed thousands of exams for evaluation of child abuse. Hr'g Tr. 359-360. Additionally, she has conducted approximately sixty exams for evaluation of child medical abuse or pediatric condition falsification. *Id.* at 360. Noting the Defendant offers no objections to her qualifications, the undersigned Magistrate Judge

finds she possesses specialized knowledge, skill, experience, training, and education and should be accepted as qualified by this Court as an expert.

Dr. Stockett was hired by DHS on July 30, 2018, to conduct a Child Maltreatment Assessment. *See* Hr'g Tr. 389-390; Hr'g Ex. 1.19. At the *Daubert* hearing, Dr. Stockett testified that "medical child abuse requires that the child received medical care as a result of the inaccurate portrayal of induction of disease by the caretaker." Hr'g Tr. 361. She stated that such a diagnosis is based on a review of medical records to determine if there is exaggeration, fabrication, or altering regarding the child's medical condition. *Id.* at 362. There is no specific test or set of characteristics consistent among all cases of child medical abuse, but there have been a number of peer-reviewed case reports providing ample research on the subject. *Id.* at 362-363. In diagnosing medical child abuse, Dr. Stockett thus uses a differential diagnosis methodology in conjunction with guidelines issued by the American Professional Society on the Abuse of Children, with clinical guidelines about Munchausen by proxy. *Id.* at 364-365; Hr'g Ex. 1.24. These guidelines, issued in 2017, include a list of thirteen warning signs to consider when evaluating cases of medical child abuse. Hr'g Tr. 366-368; Hr'g Ex. 1.24, p. 9-10. Dr. Stockett testified that a number of these warning signs existed in the relationship with the Defendant and G.Y. Hr'g Tr. 368-369. However, she also stated that she did not draw her conclusions based on this list of warning signs. Hr'g Tr. 406.

The clinical guidelines also include a section of recommendations for clinicians in caring for an alleged victim of medical child abuse. Hr'g Ex. 1.24, pp. 10-11; Hr'g Tr.

370-372.    These recommendations for evaluation include instructions to gather all past and present medical records, contact and communicate with both parents, and meet with other clinicians.  Hr. Ex. 1.24, pp. 10-11.  Dr. Stockett testified that she attempted to gather all medical records with relevant information, but that she did not review *all* of the medical records.   Hr'g Ex. 1.24, p. 10; Hr'g Tr. 369-370, 382-383.   Dr. Stockett agreed with Defendant's counsel that the "gold standard" requires the creation of a chronological table of all medical records, but that she did not do so in this case.  Hr'g Tr. 391.  The guidelines also recommend clinical documentation of the physician's records review in a chronological table, which Dr. Stockett includes in her reports.[4]  Hr'g Tr. 372; Hr'g Exs. 1.19-1.22; 1.24, pp. 12-13.  Dr. Stockett testified that, in addition to her records review, she spoke to the Defendant, hospitalists who had treated G.Y. at Saint Francis, G.Y.'s primary care doctor, a doctor with hospice care who ordered hospice for G.Y., and two GI specialists who treated G.Y.  Hr'g Tr. 381.  Additionally, Dr. Stockett conducted an in-person physical exam of G.Y.  Hr'g Ex. 1.23.

Following her review, Dr. Stockett prepared a series of Child Maltreatment Assessments beginning August 20, 2018, and going through December 8, 2019.  Hr'g Exs. 1.19-1.22.  Dr. Stockett testified that there was no new assessment done after the August 20, 2018 report, but that she continued to add to the voluminous table of records reviewed.

---

[4] Dr. Stockett testified that she authored the charts containing the records review; however, Ms. Sweet testified that she prepared the records review to aid Dr. Stockett.  Hr'g Tr. 378-379; 441. The undersigned Magistrate Judge notes that while this does not alter the conclusion as to admissibility of her opinion, such a discrepancy would be ripe for cross-examination.

Hr'g Tr. 375-376.  As part of these assessments, Dr. Stockett concludes in her report that the Defendant physically abused G.Y. through medical child abuse in three ways:  (i) the Defendant portrayed G.Y. as being terminally ill when there was indication he was not terminal, (ii) he recovered when a hospice nurse provided all his care, and (iii) the record indicated the Defendant provided medications that were no longer ordered when he was on only comfort care with hospice.  Hr'g Exs. 1.19, pp. 16-17; 1.20; 1.21; 1.22, pp. 30-31.  Dr. Stockett testified that the Defendant told her G.Y. had been placed on hospice care for pain management, but the records indicate the Defendant portrayed G.Y. as being diagnosed with a terminal illness and that is how hospice care treated him.  However, Dr. Stockett also testified that there was a point when G.Y. was dying but the Defendant refused to take him to the hospital.  Hr'g Tr. 425.  Additionally, Dr. Stockett considered that not only were certain medical interventions ultimately lifted for G.Y. (*i.e.*, TPN, g-tube feeds, oxygen, wheelchair) after he was removed from the Defendant's care, but actual diagnoses were ultimately removed from G.Y.'s assessments (such as chronic pseudo-obstructions and respiratory ailments).  *Id.* at 427-428.  When asked if anything other than medical child abuse could explain this, Dr. Stockett said, "No."  *Id.* at 386-387.

Dr. Stockett also concludes, based on her assessment, that G.Y. had been subjected to medical neglect.  She defines "medical neglect" as "not providing needed medical care." *Id*. at 388; Hr'g Exs. 1.19-1.22.  Dr. Stockett states that, based on documentation from home health, (i) there were medications the Defendant should have administered to G.Y. but had not, (ii) that G.Y. reported to home health nurses that the Defendant did not make

him use his chest physiotherapy device, and also (iii) that the Defendant was sometimes too tired to flush G.Y.'s suprapubic catheter bladder.  Hr'g Tr. 387-388.

At the *Daubert* hearing, Dr. Stockett reiterated her opinion that the Defendant physically abused G.Y. through medical child abuse based on her underlying conclusions that:  (i) the Defendant was portraying G.Y. as terminal and obtaining hospice care for him, even though he was not terminal; (ii) that G.Y. appeared near death during hospice care in June 2018, but that he recovered when a hospice nurse provided all of his care; and (iii) the Defendant was giving G.Y. medicines at the time they were no longer ordered, when he was "near death or felt to be near death."  *See* Hr'g Tr. 384-386.  Dr. Stockett further testified that she believes these actions could have led to G.Y.'s death.  *Id.* at 386.  Dr. Stockett stated that a diagnosis of "medical child abuse" occurs when a "child receive[s] medical care as a result of the inaccurate portrayal of induction of disease by the caretaker." *Id.* at 361.  Additionally, she reiterated her opinion that G.Y. was medically neglected in that the Defendant (i) did not provide G.Y. all of his prescribed medication, (ii) did not make him use his chest physiotherapy device, and (iii) was sometimes too tired to do his suprapubic catheter bladder flushes.  *Id.* at 387-388.  Dr. Stockett defines "medical child neglect" as a failure to provide needed medical care, where either it is clear to any reasonable person that a child needs medical care or a failure to provide medical care recommended by a medical provider.  *Id.* at 388.

The Defendant first contends that Dr. Stockett conducted an inadequate review of the record, noting that she provided her opinion within one week of examining G.Y. and

that she did not review all of the records in this case such that her review is inherently incomplete.[5] But to the extent that the Defendant is challenging the sufficiency of the facts or data relied upon by Dr. Stockett, the undersigned Magistrate Judge finds that the Government has met its burden here. Upon review of Dr. Stockett's testimony and taking note of the evidence considered, it is clear that she possessed sufficient facts and data to reach a medical conclusion and diagnosis. Hr'g Exs. 1.19-1.22. The Defendant, as always, remains free to cross-examine Dr. Stockett as to the specifics and breadth of her examination and analysis, and as to whether there are records in existence that would alter her opinion. *Woods*, 2022 WL 989477, at *3 (N.D. Okla. April 1, 2022) ("Defendant may cross-examine Dr. Hines on the specifics of her examination and analysis.").

As such, the undersigned Magistrate Judge must now address whether Dr. Stockett's proposed testimony aligns with Rule 702 and will assist the trier of fact or invade the province of the jury. *See Gutierrez de Lopez*, 761 F.3d at 1136 ("In assessing whether testimony will assist the trier of fact, district courts consider several factors, including whether the testimony is within the juror's common knowledge and experience, and whether it will usurp the juror's role of evaluating a witness's credibility.") (*quoting United States v. Garcia*, 635 F.3d 472, 476-477 (10th Cir. 2011)). *See also Rodriguez-Felix*, 450 F.3d at 1123 ("[T]he court will still consider other non-exclusive factors to determine

---

[5] The Defendant urges the Court to find that Dr. Stockett's review of the record was inadequate based on a Cherokee Nation District Court Opinion submitted as an exhibit to an earlier motion filed in this case. *See* Docket Nos. 116-117. While the Court may take notice of this record, the Court is not bound by its decision nor obligated to reach the same conclusions.

whether the testimony will assist the trier of fact: (1) whether the testimony is relevant; (2) whether it is within the juror's common knowledge and experience; and (3) whether it will usurp the juror's role of evaluating a witness's credibility. In essence, the question is 'whether [the] reasoning or methodology properly can be applied to the facts in issue.'") (internal citations omitted) (*quoting Daubert*, 509 U.S. at 593). The testimony here is certainly pertinent as her opinions go directly to the charges of medical child abuse and medical child neglect at issue in this case, and her opinion provides information that is not within a juror's common knowledge and/or experience.

Moreover, the undersigned Magistrate Judge finds that Dr. Stockett's opinions are the product of reliable principles that were applied to the facts and evidence in this case. Dr. Stockett reviewed the medical evidence provided to her and kept updating her report as she received more records. She also examined G.Y., interviewed the Defendant, and spoke directly with multiple doctors and specialists who treated G.Y., as well as considered the presence of several of the thirteen warning signs when evaluating cases of medical child abuse. Thus, Dr. Stockett's opinions were formed out of her skill set and knowledge base from an acknowledged medical subspecialty. These diagnoses were therefore based on the objective evidence including G.Y.'s extensive medical records, as well as her experience in assessing and treating children for whom medical child abuse and/or medical child neglect is a suspicion. As such, Dr. Stockett's knowledge, skill set, and experience allow her to reliably conclude that medical child abuse and medical child neglect were appropriate diagnoses for G.Y.

The parties have spent considerable time disagreeing about what the medical records reflect, for example, regarding G.Y. being in hospice for either pain management or a terminal illness. These disagreements *between the parties*, however, do not undermine the reliability of Dr. Stockett's opinions based on *her* review of the records. As stated above, these disagreements are ripe for cross-examination but her opinion is sufficiently reliable to present to the jury. *United States v. White*, 2022 WL 2809786, at *2 (E.D. Okla. July 18, 2022) ("So long as the witness does not in any way 'vouch' for another witness's credibility, the court is persuaded the jury's function in this regard is not usurped. While the testimony will be admitted, there is fertile ground for cross-examination by defense counsel.").

The Defendant also contends that Dr. Stockett's opinions require her to conclude that the Defendant acted intentionally, and that her opinions as to medical child abuse embraces a legal conclusion because it tracks the statute in violation of Fed. R. Evid. 704(a). Additionally, the Defendant contends that Dr. Stockett's opinion as to medical neglect is prohibited by Fed. R. Evid. 704(b). Opinion testimony is "not objectionable" simply "because it embraces an ultimate issue." Fed. R. Evid. 704(a). However, Rule 704(b) carves out a limited exception to that general proposition, providing that, "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b).

To be convicted of child abuse and/or child neglect under Oklahoma law, which

-42-

governs here, the Government must show a person, *inter alia*, "willfully or maliciously" engaged in either child abuse or child neglect. Okla. Stat. tit. 21 § 843.5(A) & (C). Child abuse is defined as:

> a. the willful or malicious harm or threatened harm or failure to protect from harm or threatened harm to the health, safety or welfare of a child under eighteen (18) years of age by a person responsible for a child's health, safety or welfare, or b. the act of willfully or maliciously injuring, torturing or maiming a child under eighteen (18) years of age by any person;

*Id.*, § 843.5(O). Child neglect is defined as

> (1) the failure or omission to provide any of the following:
> (a) adequate nurturance and affection, food, clothing, shelter, sanitation, hygiene, or appropriate education, (b) medical, dental, or behavioral health care, (c) supervision or appropriate caretakers to protect the child from harm or threatened harm of which any reasonable and prudent person responsible for the child's health, safety or welfare would be aware, or (d) special care made necessary for the child's health and safety by the physical or mental condition of the child,
> (2) the failure or omission to protect a child from exposure to any of the following:
> (a) the use, possession, sale, or manufacture of illegal drugs, (b) illegal activities, or (c) sexual acts or materials that are not age- appropriate, or
> (3) abandonment.

Okla. Stat. tit. 10A, § 1-1-105. In contrast, Dr. Stockett testified that "medical child abuse requires that the child received medical care as a result of the inaccurate portrayal of induction of disease by the caretaker," and that "medical neglect" is "not providing needed medical care." Hr'g Tr. 361, 388; Hr'g Exs. 1.19-1.22. The Government asserts that Dr. Stockett's definitions do not track the statutes and that the Government will not be arguing that Dr. Stockett's diagnoses can be substituted for the mental state or condition that is an element of the crimes charged.

-43-

The undersigned Magistrate Judge finds that the proposed testimony by Dr. Stockett as to G.Y.'s *diagnoses of medical child abuse and medical child neglect* would indeed be helpful to the jury in this case, as such issues are not within the common knowledge of a prospective juror. "Ultimately [] expert testimony is admissible under Rule 702(a) if it will simply help the trier of fact to understand the facts already in the record, even if all it does is put those facts in context." *Gutierrez de Lopez*, 761 F.3d at 1136. Such proposed testimony is not cumulative or unduly prejudicial, as it is the sole opinion testimony regarding the diagnoses of medical child abuse and medical child neglect. *See* Fed. R. Evid. 403 (relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

Furthermore, the undersigned Magistrate Judge finds that her opinions as to G.Y.'s diagnoses of medical child abuse and medical child neglect are within the parameters of Fed. R. Evid. 704, which only commands an expert to be silent "concerning *the last step in the inferential process – a conclusion as to the defendant's actual mental state*." *United States v. Garcia-Martinez*, 730 Fed. Appx. 665, 682-683 (10th Cir. 2018) (emphasis in original) ("But Agent Cronin's testimony stopped short of necessarily dictating the final conclusion that Garcia-Martinez possessed the requisite *mens rea* for conspiracy to possess and possession with intent to distribute heroin and methamphetamine.") (quotations omitted) (*citing, inter alia, United States v. Goodman*, 633 F.3d 963, 970 (10th Cir. 2011)

-44-

("As we have explained, Rule 704(b) *only* prevents experts from expressly stating the final conclusion or inference as to a defendant's mental state. The rule does not prevent the expert from testifying to facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state.") (quotations omitted). Dr. Stockett offers no opinion as to the Defendant's state of mind, and the Government is well aware that it may not substitute her opinion for the requisite *mens rea* of the crimes charged. *Cf. United States v. Moya*, 5 F.4th 1168, 1189 (10th Cir. 2021) ("But none of the experts testified about Moya's mental state. Rather, their opinions focused on the cause of Cameron's death. Though that was undoubtedly an "ultimate issue" and an element the government needed to prove, nothing in the federal rules forbids an expert from offering an opinion on that kind of factual determination.").

The undersigned Magistrate Judge likewise finds that two supporting conclusions as to Dr. Stockett's diagnosis of medical child abuse and her supporting opinions as to medical child neglect are admissible. These opinions are based on her substantial records review, her examination of G.Y., interviews with G.Y.'s treating physicians and specialists, as well as her own substantial experience as a physician board certified in child abuse pediatrics. Dr. Stockett should therefore be permitted to testify in support of the diagnosis of medical child abuse that: (ii) G.Y. appeared near death during hospice care in June 2018, but that he recovered when a hospice nurse provided all of his care; and (iii) the Defendant gave G.Y. medicines at the time they were no longer ordered, when he was "near death or felt to be near death." *See* Hr'g Tr. 384-386. Dr. Stockett should also be permitted to

-45-

testify that she believed these actions could have led to G.Y.'s death. *Id.* at 386. As to the diagnosis of medical child neglect, Dr. Stockett should be allowed to testify that "medical neglect" is "not providing needed medical care," and she may further testify in support of her diagnosis of medical child neglect that the Defendant (i) did not provide G.Y. all of his prescribed medications, (ii) did not make him use his chest physiotherapy device, and (iii) was sometimes too tired to do his suprapubic catheter bladder flushes. *Id.* at 387-388. These opinions are reliable and relevant, and the Defendant shall be permitted to cross-examine Dr. Stockett as to her examinations, methodology, and analysis. *See Woods*, 2022 WL 989477, at *3; *Tyson Foods, Inc.*, 656 F.3d at 780; *Gutierrez de Lopez*, 761 F.3d at 1136. Furthermore, the undersigned Magistrate Judge finds that the aforementioned opinions are admissible under Rule 702, and that their probative value is not substantially outweighed by the danger of unfair prejudice. Any danger of unfair prejudice, particularly as to the diagnoses of medical child abuse and medical child neglect in contrast to the legal definitions of the charges by the same name, can be ameliorated with a jury instruction. *See Chapman*, 839 F.3d at 1240.

Further discussion is warranted, however, as to the definition of medical child abuse and one of the opinions underlying this diagnosis. Dr. Stockett's underlying definition of medical child abuse states that it requires that a "child received medical care as a result of the inaccurate *portrayal* of induction of disease by the caretaker[.]" Hr'g Tr. 361 (emphasis added). This assertion as to how a caretaker must have acted is inadmissible because it improperly opines on the Defendant's credibility. *See Toledo*, 985 F.2d at 1470; *Hill*, 749

F.3d at 1260-1261. The same must also be said for Dr. Stockett's underlying conclusion as to medical child abuse (i), that G.Y. "was portrayed as being terminal and was receiving hospice care even though there was indication that he wasn't terminal." Hr'g Tr. 385. Although the definition and supporting statement are inadmissible, the undersigned Magistrate Judge notes that Dr. Stockett may rely on inadmissible facts or data to form her ultimate (admissible) diagnosis of medical child abuse, *see* Fed. R. Evid. 703, and she "may state an opinion—and give the reasons for it—without first testifying to the underlying facts or data," Fed. R. Evid. 705. *See United States v. Mirabal*, 2010 WL 3834072, at *7 (D.N.M. Aug. 7, 2010) ("While Aguilar can cross-examine Eshelman about the data on which she relies to the extent that the data is inadmissible, the United States is limited to eliciting Eshelman's opinions, and may not disclose through her the inadmissible data. The Court will be vigilant, on objections by Aguilar, to exclude testimony regarding any inadmissible data on which Eshelman relies.") (*citing* Fed. R. Evid. 703,705). As with the other experts, Dr. Stockett may certainly testify as to the factual basis for her conclusions, including her review process, who she interviewed and consulted with, and any discrepancies in the medical record that contributed to her conclusions so long as they do not opine on the Defendant's credibility. *See Davoll*, 194 F.3d at 1138. And this does not affect her ability to offer her ultimate opinions as to G.Y.'s diagnoses, or her ability to offer her other underlying conclusions. *See United States v. Rodriguez*, 125 F. Supp. 3d 1216, 1248 (D. N.M. 2015) ("Under Rule 703, experts can testify to opinions based on

-47-

inadmissible evidence, including hearsay, if "experts in the field reasonably rely on such evidence in forming their opinions.").

The undersigned Magistrate Judge thus finds that Dr. Stockett is qualified as an expert as well as fact witness in this case, that her testimony is both reliable and relevant, and that her testimony is admissible as to her diagnosis of medical child abuse as to G.Y., as well as the underlying conclusions (ii) G.Y. appeared near death during hospice care in June 2018, but that he recovered when a hospice nurse provided all of his care; and (iii) the Defendant gave G.Y. medicines at the time they were no longer ordered, when he was "near death or felt to be near death." Furthermore, her statement that she believed these actions could have led to G.Y.'s death is admissible. However, Dr. Stockett's opinion and/or expertise is not admissible as to the definition of medical child abuse and underlying conclusion (i), that G.Y. "was portrayed as being terminal and was receiving hospice care even though there was indication that he wasn't terminal." Similarly, Dr. Stockett's opinion is admissible as to her diagnosis of medical child neglect, the definition of medical child neglect, and her underlying conclusions that the Defendant (i) did not provide G.Y. all of his prescribed medications, (ii) did not make him use his chest physiotherapy device, and (iii) was sometimes too tired to do his suprapubic catheter bladder flushes.

## **CONCLUSION**

In summary, the undersigned Magistrate Judge PROPOSES the findings set forth above and accordingly RECOMMENDS that the Defendant's Motion to Exclude Expert Witness Testimony Pursuant to *Daubert* and Federal Rule of Evidence 702 [Docket No.

135] be GRANTED IN PART and DENIED IN PART. Additionally, the undersigned Magistrate Judge recommends that the Government's Motion to Exclude Expert Witness Testimony and Motion to Compel Records [Docket No. 177] should be granted as to the request to exclude Dr. Grundy's testimony and denied as moot as to the motion to compel records. Objections to this Report and Recommendation must be filed within fourteen days. *See* 18 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2).

IT IS SO ORDERED this 5th day of October, 2022.

_____
**GERALD L. JACKSON**
**UNITED STATES MAGISTRATE JUDGE**